Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| M.A., and A.A., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY, and the EISNER LLP GROUP LIFE MEDICAL and LTD PLAN., <br><br> Defendants. | COMPLAINT <br><br> Case No. 2:23-cv-74 |

Plaintiffs M.A. and A.A., through their undersigned counsel, complain and allege against

Defendants Cigna Health and Life Insurance Company ("Cigna") and the Eisner LLP Group Life

Medical and LTD Plan [sic] ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  M.A. and A.A. are natural persons residing in New York County, New York. M.A. is

    A.A.'s father.

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). M.A. was a participant in the Plan and A.A. was a beneficiary of the Plan at all relevant times. M.A. and A.A. continue to be participants and beneficiaries of the Plan.

4. A.A. received medical care and treatment at Innercept LLC ("Innercept") from March 25, 2020, to December 20, 2022. Innercept is a residential treatment facility located in Idaho, which provides sub-acute inpatient treatment to adolescents and young adults with mental health, behavioral, and/or substance abuse problems.

5. Cigna denied claims for payment of A.A.'s medical expenses in connection with her treatment at Innercept.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because Cigna has a significant business presence with business offices and extensive activities in Utah.

8. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.A.'s Developmental History and Medical Background

10. As a child, A.A. seemed to be relatively happy. She had a small group of friends and she got along well with them. She had anxiety which often made it difficult for her to participate in class. Around the time that she was seven years old, A.A. refused to eat regularly for a six-month period. She stated that she was afraid that she would choke on her food. A.A. started seeing a therapist and was eventually able to overcome her fears and resume eating.

11. A.A. did well in school but became increasingly anxious in social situations and sometimes refused to go to class. A.A. continued to do well through the end of high school, but over a short period of time she had a series of traumatic experiences which were very difficult for her.

12. Her mother underwent a painful surgery, her grandfather had a choking accident which led to him losing consciousness and passing away a short time later, her boyfriend was

diagnosed with diabetes, and one of her friends was hospitalized due to undiagnosed Crohn's disease.

13. On a vacation following these events, A.A. started experiencing periods of extreme lethargy and anxiety. She was taken to the emergency room and no medical cause was found, however A.A. spent most of the vacation either sleeping or on the couch. These episodes started becoming increasingly common.

14. A.A. was admitted to the university she wanted to attend, but she had difficulty making and keeping friends and increasingly isolated herself. The university had a special weekend for parents to visit, but A.A. was uncharacteristically clingy, and her parents noticed that she would ignore whenever people would wave or reach out to her.

15. A.A. felt like she had no social life. She started showing some obsessive type behaviors such as throwing out most of her clothing, keeping her room extremely clean, and feeling compelled to keep things meticulously organized. A.A. also became increasingly picky about the foods she would eat and lost about thirty pounds in a short period of time.

16. A.A. started meeting with a counselor. A.A. stated that she felt like something was making her feel like she couldn't eat. She had frequent anxiety attacks and often ended up in the emergency room. A.A.'s weight loss was extreme enough that it resulted in tachycardia, a dangerously slowed heart rate.

17. A.A. met with a psychiatrist and was diagnosed with obsessive-compulsive disorder, depression, and an eating disorder. A.A. started attending an intensive outpatient program multiple times a week and met with therapists with a specialization in treating OCD, but she continued to feel what she described as "a force" which made her do things in a certain way.

18. Some of A.A. compulsions included acts of self-harm such as cutting and burning herself. She expressed a belief that she if she did not give into these compulsions, something horrible would happen to people that she cared about.

19. A.A. started attending an eating disorder program but would only eat about four different types of food, and even then she would eat only very little and would only allow herself to eat if the food was categorized and fit within the obsessive system of internal rules she had set for herself.

20. A.A. was not putting on any weight and continued to self-harm so she was taken to a residential treatment program for eating disorders called Rogers Memorial. A.A. continued to refuse to eat and was placed on a feeding tube for a four-month period.

21. A.A. continued to receive outpatient treatment in a variety of settings and was able to find a part-time job, nevertheless, she continued to struggle with her eating disorder and was admitted to a partial hospitalization program. Following this treatment, A.A. started to improve and was able to do things that she had been unable to do for a long time like socialize and build relationships with others.

22. A.A. started attending classes at a new college but soon reported having anxiety and struggling with intrusive thoughts. A.A. confessed to her therapist that she was hearing voices telling her to harm herself. On the therapist's recommendation A.A. was taken to the emergency room. A.A. remained hospitalized from September 25, 2019, through October 18, 2019. A.A. was forced to take a medical leave of absence from the university.

23. A.A. received a neuropsychological evaluation and started meeting with a new therapist. She was hospitalized again on January 16, 2020, through January 31, 2020, due to incidents of self-harm by cutting.

24. A.A. attended a residential program in Georgia called Skyland Trail from February 5, 2020, through March 25, 2020, and while her psychotic thoughts decreased, her depression increased and she became more suicidal. A.A. was then admitted to Innercept.

**Innercept**

25. A.A. was admitted to Innercept on March 25, 2020.

26. In a letter dated April 24, 2020, Cigna denied payment for A.A.'s treatment at Innercept from April 23, 2020, forward. The letter gave the following justification for the denial:

> We reviewed information from INNCERCEPT LLC, your health plan and any policies and guidelines needed to reach this decision. We found the service requested is not medically necessary in your case.
>
> Based upon the available clinical information, your symptoms do not meet the Cigna Behavioral Health Medical Necessity Criteria for Residential Mental Health Treatment for Adults for continued stay from 04/23/2020 forward, as you have learned new skills in treatment. You do not have any serious problems with your physical health. You have been working on better coping skills. You do not have thoughts and plans of ending your life. You have not been hurting other people. You are sleeping and eating normally. The treatment provided has led to sufficient improvement in the moderate-to-severe symptoms and/or behaviors that led to this admission so that you can be safely and effectively treated at a less restrictive level of care. Less restrictive levels of care are available for safe and effective treatment.

27. On September 29, 2020, M.A. submitted a level one appeal of the denial of payment for A.A.'s treatment. M.A. reminded Cigna that he was entitled to certain protections under ERISA during the review process including a full, fair, and thorough review conducted by appropriately qualified reviewers, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination,

referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

28. M.A. also asked to be provided with a physical copy of any documentation related to the initial decision as well as the level one appeal decision, including the reviewers' internal notes.

29. M.A. contended that the criteria utilized by Cigna violated generally accepted standards of medical practice. He pointed out that Cigna's denial letter relied on factors like, "[y]ou do not have thoughts and plans of ending your life" and, "[y]ou have not been hurting other people" to justify its decision to deny payment.

30. He stated that these were acute level symptoms and should not have been used to assess the medical necessity of a non-acute level of treatment. He argued that Cigna's stated denial rationale was inconsistent with its own residential treatment criteria. He quoted these criteria and noted that they contained no acute level requirements. He claimed that A.A. met these criteria and her treatment would have been approved had Cigna used its own residential treatment guidelines or the definition of medical necessity in the insurance policy.

31. He contended that Cigna engaged in the same behaviors of improperly requiring acute symptoms as a treatment limitation for coverage of sub-acute care that other courts had rejected.

32. He further alleged that Cigna limited the availability of residential treatment care through other means such as failing to address the effective treatment of co-occurring conditions, and pushing patients into a lower level of care regardless of whether such treatment could be considered safe or effective.

33. He contended that A.A. required the treatment she was receiving in order to effectively treat her complex conditions which had not been able to be effectively addressed in other levels of care, including both outpatient care and the acute inpatient hospitalization setting. He contended that despite the treatment A.A. had received, she was unable to make any meaningful and lasting progress. He wrote that A.A. had been admitted to Innercept on the recommendations of her treatment team.

34. M.A. voiced his concern that Cigna's denial was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to administer benefits for behavioral health services in a manner which was no more restrictive than benefits for analogous medical or surgical services. He identified skilled nursing, inpatient hospice, and subacute rehabilitation facilities as some of the medical or surgical analogues to the treatment A.A. received.

35. He alleged that Cigna violated MHPAEA by denying A.A.'s residential treatment care based on acute level criteria when it did not use acute level criteria for sub-acute medical or surgical treatment such as skilled nursing care.

36. In fact, M.A. wrote that he was not able to find any of Cigna's criteria for skilled nursing, inpatient rehabilitation, or hospice facilities at all. He wrote that inasmuch as Cigna required residential treatment centers to satisfy requirements in proprietary criteria but had no such criteria for analogous medical or surgical services, it also violated MHPAEA.

37. He requested that Cigna perform a MHPAEA compliance analysis on the Plan and provide him with physical copies of the results of this analysis as well as any and all documentation related to the analysis.

38. He argued that it was clear from A.A.'s history that she required the level of care she was receiving at Innercept to adequately address her unique treatment needs and psychological issues, especially given the historical failures of other levels of care.

39. M.A. included copies of A.A.'s medical records as well as letters of medical necessity with the appeal. Among other things, these records showed A.A.'s struggles with disordered eating (which led to malnutrition and a dangerously slow heartrate), intrusive thoughts, depression, and compulsive behaviors, punishing herself for being happy, and self-harming (including an incident where she broke a lightbulb while in residential treatment and cut herself with it).

40. The records also show that A.A.'s treatment team stated just prior to her admission to Innercept that "it is crucial" for A.A. be placed in an appropriate residential setting "that will address her underlying psychosis."

41. The appeal included medical records both prior to her admission to Innercept as well as records during her time there. The records at Innercept included a June 15, 2020, incident where A.A. felt that "the presence" was trying to take over her body, A.A. then poured boiling water on her arm in an attempt to self-harm. In another note, A.A. stated a few days later that she was having difficulty using coping skills to keep herself safe.

42. An August 26, 2020, note described A.A. as remaining "at chronic risk for self-harm" A.A. reported multiple incidents where she felt suicidal during her time at Innercept.

43. In a letter dated May 29, 2020, Alicia Hirsch, Psy. D. stated:

> This letter is in reference to Ms. [A.A.] whom I treated from November 12, 2019 through January 14, 2020.
>
> Ms. [A.A.] was referred to me for Obsessive-Compulsive Disorder and eating disorder symptoms. In addition, she presented with a history of self-harm behaviors. At the onset of treatment her Y-BOCS (Yale-Brown Obsessive

Compulsive Scale) score was 35 (extreme) and there was question of psychotic symptoms as well. She was referred for neuropsychological testing and the results reflected Autism Spectrum Disorder, Obsessive-Compulsive Disorder, and psychotic symptoms. It was determined in January of 2020 that outpatient care would not be the appropriate treatment, and a residential program would be critical in helping her get well.

During my time working with Ms. [A.A.], it was clear that she was committed to getting better, but outpatient care would not be sufficient in treating her symptoms. It is my strong recommendation and clinical opinion that Ms. [A.A.] continue to stay in a residential setting.

44. A January 2020 hospital psychiatric assessment stated in part:

Patient is presenting for their first admission to Four winds Hospital and is seeking admission for evaluation due to feeling unsafe and as if someone is watching her and trying to get her to hurt herself. Patient reported during assessment that this person threatens her saying it can control her. She reports onset of symptoms a few months ago and that it is getting worse as she is thinking about it constantly. Patient denied knowing a trigger and stated that this person is always there. She states that it is just the one woman.

Patient reports feeling as if the woman is real but she doesn't know her. Patient reports that the woman tells her to hurt herself and that there are things that she is supposed to be doing but she doesn't tell the patient what those things are. Patient states that the woman threatens that if she doesn't complete the things she tells her to do that she will take more control over her. She states that she never had a vision of the woman but it sounds like a typical female voice. Patient reports that one of the things that the woman tells her to do is to cut herself. Patient states that she has cut herself at the woman's command but that she doesn't do it every time. She states that the last time she cut was about two weeks ago.

Patient states that due to what she is experiencing she is constantly unsure of who to trust because she is fearful that they are part of this woman's plan. She states that this includes her parents because she is not always sure she can trust them.

Patient also identifies increased depression and anxiety secondary to the presence of the woman. Patient reports that she feels really hopeless and sometimes thinks about killing herself but states that she doesn't have a plan.

45. A.A.'s March 25, 2020, discharge summary from Skyland Trail residential treatment center stated in part:

After graduation from high school she came to believe there was a "presence" in her life that was frightening and ominous. In reaction to that she developed what

seemed to be OCD symptoms, a rigid way of eating and need for order/symmetry with the intent of warding off any dangerous or bad things happening. She was hospitalized in 2018 for what was thought to be eating disorder but was probably OCD behaviors. She did not have distorted body image or even wish to lose weight. These symptoms have since dissipated for the most part.

With time this "force/power" within developed into a female voice threatening her or commanding her to do things. Patient believes "I'm different and supposed to do something: I know things others don't know and I can do things on a large-scale that others can't do". She believes this "woman" or "special force" can control her mind and behavior. The special power feels burdensome and distressing. She is able to resist command hallucinations now (in the past she heard voice [sic] to cut herself). She has no other dangerous command hallucinations. She admits to ideas of reference, that have improved since increasing Latuda. She has the belief that TV or certain conversations are sending her messages, which confuses her and makes her upset. She is depressed and frustrated by these experiences, and is anxious. …

Reason for Discharge:

- Client has not completed the program because client is transferring to another program for services not provided by Skyland Trail.

POST DISCHARGE CARE AND SUPPORT

- Other: continued residential treatment

46. Jill Rickel, M.S., CEP, wrote in part in a May 2020 letter:

During [A.A.]'s stay at Skyland Trail, her primary therapist Bethany Elmore MAMFT, along with the rest of the Skyland Trail medical and treatment team, determined that as [A.A.]'s psychotic symptoms lessened, [A.A.]'s other struggles became more evident. Diagnostically, even while in a sub-acute level of care, [A.A.] was showing signs of isolation, depression, lack of social skills, suicidal ideation, and healthy separation from her family. It was determined, and therefore recommended that [A.A.] transfer to a longer-term treatment program.

All treatment professionals involved, along with this consultant, determined that the longer-term program needed to: be a residential treatment center for young adults, have an in-house psychiatrist, do strong individual and milieu work, incorporate family therapy, have 24/7 oversight, be small enough for [A.A.] not to be able to isolate and avoid, and have differing levels of care to support [A.A.] during her time of crisis.

Innercept, a residential treatment center in Coeur D'Alene, Idaho met these stringent requirements and after considerable research by Mr. & Mrs. [A.], [A.A.]

enrolled on March 25, 2020. There was no program locally, in New York that met [A.A.]'s clinical needs.

[A.A.] is currently under the care of her psychiatrist, Dr. George Ullrich, her therapist, Christine Summering, MA, and other staff at Innercept. This consultant is monitoring the case via consistent communication with staff. It has been determined by the Innercept team that [A.A.] is an excellent candidate for the program but without completing it in its entirety, [A.A.] remains a serious risk. She has made improvements in many areas but remains at great risk for self-harm and the psychosis has returned to some extent. [A.A.] has been able to spend some time in Innercept's intensive program but has been moved to Innercept's stabilization house for 1:1 care on several occasions as a result of self-harm. [A.A.] is there presently following a self-injury that required medical care at a hospital.

As experts in young adult residential placement and after 14 years in this field serving hundreds of clients, it is the professional opinion of the consultants at AO Therapeutic Consulting, Inc. that [A.A.] was, and remains in need of the highest level of clinical care in a residential treatment center.

47. Dr. Steven Poskar, M.D. wrote in part in a letter dated May 18, 2020:

Ms. [A.A.] has a history of self-harm and exhibited self-harm behavior during the course of treatment. This behavior, in combination with Ms. [A.A.]'s diagnoses led to the strong recommendation Ms. [A.A.] be admitted to an inpatient program, followed by residential treatment.

Continued residential treatment is critical to Ms. [A.A.]'s health and care. Given Ms. [A.A.]'s condition, our office does not recommend outpatient care at this time.

48. Bethany Elmore, MAMFT, wrote in part in a letter dated May 21, 2020:

Despite a decrease in her psychotic symptoms, [A.A.]'s anxiety and depression persisted. The treatment team observed that she continued to isolate and have significant difficulties engaging in exposures to social situations and fully engaging in treatment, even with frequent and intensive coaching and support from staff. The team supported a transfer to a different residential program to provide more targeted interventions, coaching, and exposures in order to facilitate movement toward independence, while continuing to address her anxiety and depressive symptoms. After initial resistance to engage in treatment elsewhere, [A.A.] became willing to transfer to another program , acknowledging her need for different treatment approach than was offered at Skyland Trail.

49. M.A. argued that it was the clear and unequivocal opinion of all of A.A.'s treating professionals that she required the level of residential treatment that she was receiving. He asked Cigna to elaborate on what basis it disagreed with the providers who had worked with A.A. on a firsthand basis and had actively witnessed the deterioration of her conditions.

50. M.A. contended that A.A.'s treatment was clearly medically necessary and if she did not receive this intervention and learn how to effectively institute and practice coping mechanisms, she would be unable to maintain her physical safety and keep herself free from harm.

51. M.A. asked in the event the denial was upheld to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, and any administrative service agreements that existed. To ensure MHPAEA compliance he also asked for any clinical guidelines or medical necessity criteria used in the determination, along with their medical or surgical equivalents, regardless of whether these were used. In addition, he asked for any reports or opinions concerning the claim from any physician or other professional, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

52. In a letter dated October 29, 2020, Cigna upheld the denial of payment for A.A.'s treatment. The letter stated that it was a response to "the appeal submitted by Innercept" and gave the following justification for the denial:

> Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Behavioral Health Medical Necessity Criteria for continued stay at Residential Mental Health Treatment for Adults level of care from 4/23/2020 – 4/4/2021 as the treatment provided had led to

sufficient improvement in the moderate-to-severe symptoms and/or behaviors that led to this admission so that you could be safely and effectively treated at a less restrictive level of care. You have not been reported to have any threat presented to anybody, medical instability or neglect of basic health needs. You are said to be able to understand information presented to you. Less restrictive levels of care were available for safe and effective treatment.

53. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

54. The denial of benefits for A.A.'s treatment was a breach of contract and caused M.A. to incur medical expenses that should have been paid by the Plan in an amount totaling over $200,000.

55. Cigna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of M.A.'s request.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

56. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

57. Cigna and the Plan failed to provide coverage for A.A.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

58. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation

appeal process. 29 U.S.C. §1133(2).

59. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in M.A.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

60. In fact, it is unclear whether Cigna reviewed M.A.'s appeal at all. Cigna's response refers to "the appeal submitted by Innercept" and makes no reference to any of the materials provided. Presumably if Cigna had made any effort to examine M.A.'s appeal, it would have addressed how its statements such as,"[y]ou have not been reported to have any threat presented to anybody" were congruent with A.A. experiencing command hallucinations and pouring boiling water over her arm while at Innercept.

61. Cigna and the agents of the Plan breached their fiduciary duties to A.A. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.A.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.A.'s claims.

62. The actions of Cigna and the Plan in failing to provide coverage for A.A.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

63. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate

remenies under both causes of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

64. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

65. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

66. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

67. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

68. The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

69. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.A.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

70. For none of these types of treatment does Cigna exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

71. When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

72. Cigna and the Plan evaluated A.A.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. M.A. identified two examples of the disparate application of medical necessity criteria between medical/surgical and mental health treatment. The first was that Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.A. received. Cigna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Cigna's denial letters such as "You do not have thoughts and plans of ending your life. You have not been hurting other people."

74. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.A. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

75. Individuals receiving care at the residential treatment environment typically do not present with active suicidal ideation or self-harming behaviors. Generally, these individuals are sent to an acute hospital setting and are only released to residential care when the danger they present is able to be safely managed at the sub-acute level.

76. Cigna's denial does not respect this nuance. It requires that individuals receiving residential treatment care be experiencing suicidal ideation and present a threat to themselves or others to receive residential treatment care, regardless of any other symptoms which would render residential treatment medically necessary.

77. In this case, the medical records directly contradict Cigna's assertion and show that A.A. was suicidal and was a threat to herself (albeit at a level that Innercept felt could be safely managed at their facility). Cigna therefore, not only denied care due to factors which are typically absent, or at least under control, in the residential setting, but in the instant case it used these factors to justify its decision to deny care, when the medical record it was provided with indisputably shows that they are present.

78. In addition, the level of care applied by Cigna failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

79. Generally accepted standards of medical practice for medical and surgical rehabilitation

under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved. In addition, A.A.'s treatment team strongly cautioned against releasing her to outpatient care.

80. The second example M.A. offered of a MHPAEA violation was Cigna's actions of restricting the availability of A.A.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. M.A. argued that not only did Cigna exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. M.A. requested to be provided with these criteria if they existed, but Cigna failed to either produce the criteria or respond in any way to this point presented by M.A.

81. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

82. Cigna and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Cigna and the Plan were not in compliance with MHPAEA.

83. In fact, despite M.A.'s request that Cigna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and

claim administrators perform parity compliance analyses, Cigna and the Plan have not provided M.A. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Cigna and the Plan have not provided M.A. with any information about the results of this analysis.

84. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

85. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for A.A.'s medically necessary treatment at Innercept under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 31st day of January, 2023.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
New York County, New York